IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:11CR3138 |
| | ) | |
| v. | ) | |
| | ) | FINDINGS, RECOMMENDATION, |
| THOMAS J. SCHILDT, | ) | AND ORDER |
| | ) | |
| Defendant. | ) | |

The defendant has moved for an order suppressing statements he made during the search of his residence but prior to his formal arrest on November 16, 2011. (Filing No. 28). The defendant claims his Fifth Amendment rights were violated because he was in custody, but was not advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), prior to being interrogated by Investigator Kerry Crosby of the Nebraska Attorney General's Office.[1] For the reasons discussed below, the defendant's motion should be denied.

FACTUAL FINDINGS

On November 16, 2011, at approximately 7:50 a.m., law enforcement officers arrived at the defendant's home to execute a warrant to search the defendant's computers for evidence of child pornography. See exhibit 1. The five officers who executed the warrant included Investigators Christina Vath, Ed Sexton, and Kerry Crosby of the Nebraska Attorney General's Office, and Investigators Jackson and Moreno of the Gering Police Department. Investigators Vath, Sexton, and Crosby were wearing black vests with lettering which identified them as officers from the Attorney General's office; Investigator Jackson

---

[1]The defendant claims statements made prior to and while he received his advice of rights must be suppressed under the prophylactic protection of Miranda. He does not claim the statements were involuntary. Filing No. 41, (hearing transcript), 3:1-14.

was in uniform, and Investigator Moreno was in plain clothes. The officers were armed, but their weapons were completely or at least partially concealed and were never drawn during the entry and search of the defendant's home.

When the officers arrived at the defendant's home, Investigator Jackson knocked on the defendant's door. The defendant, who was home alone at the time, opened the door. Investigator Vath advised the defendant that the officers were present to search the defendant's home computer equipment, and she handed a copy of the warrant to the defendant. The defendant was calm and appeared to have just awakened. He asked what the officers intended to search, and was advised the officers would be searching for images of concern located on the defendant's computers.

Investigator Kerry Crosby stood with the defendant in the entryway near the front door while the other four officers proceeded into the residence to check for other occupants. The defendant was not touched or restrained, was not told he must stay in the home during the search, and did not indicate he wanted to leave.

After the home was cleared, officers Vath, Sexton, Jackson, and Moreno searched for computers in the home. Investigator Crosby remained with the defendant. Investigator Crosby asked the defendant were his computer was located. The defendant responded that his computer was downstairs.

The kitchen, which was on the main floor of the home and adjacent to the front door, was equipped with a table and chairs. Investigator Crosby cleared a kitchen chair so the defendant could sit while being afforded the opportunity to read the warrant. The defendant began but did not finish reading the search warrant. After reading only the first paragraph or two, the defendant stated he understood. Investigator Crosby asked what the defendant

understood. The defendant did not immediately respond because he noticed an officer walking down the hall toward the bedrooms. He advised that officer that the computer in the bedroom area was a broken laptop with no hard drive, so there was nothing on it, and the computer the officers were looking for was in the basement.

Investigator Crosby asked the defendant if he knew why the officers were there. The defendant responded that he had been "downloading a bunch of crap" on his computer. See exhibit 2. Investigator Crosby asked the defendant to explain what he meant by "crap." While pointing at the description of child pornography as set forth in the search warrant, the defendant stated he had been "downloading all this stuff." Id.

Investigator Crosby asked if there were pictures, videos, or files on the defendant's computer which depicted persons under the age of 18 engaged in sex acts or sexually explicit conduct. The defendant responded, "Yes." Investigator Crosby asked if the defendant lived in the home with anyone other than his mother. The defendant said, "No." In response to the officer's questions, the defendant acknowledged his mother was not downloading and viewing child pornography.

At this point, Investigator Crosby decided the defendant would be arrested. He began advising the defendant of his Miranda rights, but was interrupted by the defendant before he advised the defendant of his right to counsel. The defendant had directed his attention to Investigator Jackson, who was opening a pantry door. The defendant advised the officers that they did not need to search the entire house.

Returning his attention to Investigator Crosby, the defendant asked if he would be required to register as a sex offender. Investigator Crosby responded that the defendant was "getting way ahead" of the officers, but acknowledged it was possible. The defendant stated

he did not mean to harm anyone, and he had tried to quit downloading images from the internet, but could not. Investigator Crosby stopped the defendant from speaking, stating "Let me finish what I have to tell you." He then continued to advise the defendant of his <u>Miranda</u> rights, beginning with defendant's right to counsel.

The defendant stated he wanted to talk and wanted to hand the information over to the officers. Investigator Crosby stated he would give the defendant an opportunity to cooperate. The defendant and Investigator Crosby went into the basement. While they were walking, the  defendant again stated he had tried to quit viewing or collecting child pornography but could not. The defendant walked directly to the computer and an external hard drive located on a desk in the basement, and he stated this equipment contained the images.

Investigator Crosby escorted the defendant back upstairs. The defendant promised he would quit collecting and viewing child pornography if the officers would just take the hard drive and leave. Investigator Crosby explained that the defendant was dealing with an addiction, and stated the officers could not simply accept the defendant's promise to quit. The defendant asked for leniency, and the officer advised he could not offer leniency. The officer asked when the defendant began collecting child pornography. The defendant invoked his right to counsel, and was not questioned thereafter. The defendant was arrested for possession of child pornography.

The communications between the defendant and Investigator Crosby were conversational in tone. The defendant was never restrained during the discussion, and his ability to leave was never impeded. But the defendant was never told he was free to leave while the home was being searched.

## LEGAL ANALYSIS

<u>Miranda</u> "requires that a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued prior to questioning whenever a suspect is (1) interrogated (2) while in custody." <u>United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir.1990)</u>. As to Investigator Crosby's discussions with the defendant prior to defendant's arrest, there is no real question that the defendant was interrogated. Asking whether the defendant's computer contained images of child pornography and if he was the only person in the home who collected such images were questions "reasonably likely to elicit an incriminating response." <u>Rhode Island v. Innis, 446 U.S. 291, 302 (1980)</u>.

The issue is whether defendant Schildt was in custody during the interrogation conducted by Investigator Crosby on November 16, 2011 before he was formally arrested. The Eighth Circuit has very recently reiterated[2] the legal standards applicable to this question.

> A suspect is in custody if a reasonable person in his position would not have felt free to terminate the interrogation and leave. . . . We have identified six non-exclusive factors for determining whether a suspect is in custody: (1) whether police told the suspect that the questioning was voluntary, the suspect could leave or ask the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect's movement was restrained during the questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether police used strong arm tactics or deceptive stratagems during questioning; (5)

---

[2] <u>U.S. v. Cowan, 2012 WL 967965 (8th Cir. March 23, 2012)</u> was issued after the parties' briefing and the evidentiary hearing, but it did not change the legal standards applicable to the issue of custody. Therefore, no additional briefing by the parties was necessary or requested prior to issuing these findings and a recommendation.

whether the atmosphere of the questioning was police dominated; and (6) whether the suspect was arrested at the end of the questioning. . . . The critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's freedom to depart was restricted in any way.

U.S. v. Cowan, 2012 WL 967965 (8th Cir. March 23, 2012) (internal citations and quotation marked omitted).

The law enforcement officers did not advise defendant Schildt that he was free to leave while they searched his residence, and prior to advising the defendant of his right to remain silent, the defendant was not told that he could refuse to answer questions. Prior to being arrested, the defendant was never told he was not under arrest, and after being questioned, the defendant was arrested. But prior to his arrest, the defendant never indicated he wanted to leave and he actually stated he wanted to help the officers search his home computer. Other than when the defendant, of his own request, went into the basement to make sure the officers had located his computer, the defendant was seated at his kitchen table. He was never handcuffed or restrained prior to arrest. No weapons were drawn, and it is unlikely the defendant even saw the officers' sidearms. Based on the evidence before the court, Schildt knew he was not under arrest while being questioned–he was negotiating with the officers, asking them to leave in exchange for his promise to quit collecting and viewing child pornography. Schildt initiated conversation and eagerly spoke with Investigator Crosby; so much so that even after the defendant was advised of his right to remain silent, Investigator Crosby had to ask Schildt to stop talking so the officer could finish the Miranda advisement. Investigator Crosby used no "strong arm tactics or deceptive stratagems" while questioning the defendant. His tone was professional and conversational throughout, and all his statements were true. The questioning occurred within the defendant's own home, and although five officers were located within the residence, for the

most part, only Investigator Crosby was in the same room with the defendant during questioning. The questioning lasted less than ten minutes. When Investigator Jackson opened the pantry door, the defendant spoke up, stating the officers need not look through the whole house to find the computer equipment identified in the warrant–conduct indicating the defendant did not feel restricted or intimidated by the officers' presence in his home.

Considered in the totality, a reasonable person in Schildt's position would have felt free to stop talking with the officers and leave his home. "While a person may be deemed to be in custody even in his own home, it is not the type of coercive setting normally associated with custodial interrogation." U.S. v. Sutera, 933 F.2d 641, 647 (8th Cir. 1991). Moreover, once the officers decided to arrest the defendant, which in turn prompted Investigator Crosby to begin advising the defendant of his Miranda rights, the statements made during the advice of rights were not in response to custodial interrogation. "The fact that the investigation has proceeded to a point in time at which it may be said to have focused on the defendant does not make an interrogation of the defendant custodial." U.S. v. Jones, 630 F.2d 613, 616 (8th Cir. 1980).

The defendant was not in custody prior to his formal arrest. See, e.g., Sutera (holding the defendant was not in custody even though six armed officers entered his apartment to execute a search warrant, frisked him, searched his apartment for three and one-half hours, prevented him from using his phone or his car during the search, interviewed him for an hour in isolation, accompanied him to retrieve an address book, and used nonverbal expressions indicating that he was not free to leave). Schildt was not questioned after his arrest. His Miranda rights were not violated, and his motion to suppress should be denied.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Court Judge, that the defendant's motion to suppress, (filing no.28), be denied.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

IT IS ORDERED that the trial of this case is set to commence before the Honorable Richard G. Kopf at 9:00 a.m. on June 4, 2012, or as soon thereafter as the case may be called, for a duration of four (4) trial days. Jury selection will be held at commencement of trial.

DATED this 11th day of April, 2012.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.